# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| GEORGE COOLIDGE and JOHN WIGGINS, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| FORD MOTOR COMPANY, a Delaware Corporation | |
| Defendant | |

## CLASS ACTION COMPLAINT

Plaintiffs George Coolidge ("Coolidge") and John Wiggins ("Wiggins") (collectively, the "Plaintiffs") on behalf of themselves and all others similarly situated, including a proposed Nationwide Class, New York State Sub-Class, and Colorado Sub-Class, as more fully more fully described below, allege the following based on personal knowledge as to their own and acts and experiences and, as to all other matters, based on the investigation of their counsel:

## I.     INTRODUCTION

1.     This consumer class action arises out of Defendant Ford Motor Company's ("Ford" or "Defendant"), manufacture and sale of 2020-present Ford Explorer 2.3L or 3.0L ST vehicles ("Class Vehicle(s)" or "Defective Class Vehicle(s)").  The Defective Class Vehicles are uniformly and dangerously defective in that they are equipped with a rear subframe assembly attached to the vehicle by only one rear axle horizontal mounting bolt ("Rear Subframe Assembly") which does or can cause or otherwise result in a sudden, even violent, disconnection of the rear drive shaft assembly or its component parts, especially including while the vehicle is in motion (the "Rear Subframe Assembly Defect" or "Defect"). The Defect results in the total loss of driver control - steering, breaking and speed control - of the Class Vehicle while in operation, drastically increasing the risk of collision, which threatens and risks injuring passengers, bystanders, property, and other

2

vehicles' drivers and passengers. This poses extreme safety hazards to owners, lessees, passengers, and the public at large.

2.     Defendant Ford manufactured, marketed, distributed, sold, and/or caused to be sold or leased the Class Vehicles to consumers, including Plaintiffs, without disclosing their uniform and dangerous Defect, which it has yet to remedy.

3.     Defendant Ford's actions have violated sacred obligations and duties of car manufacturers to provide consumers with vehicles that are safe and to alert them to, or otherwise warn them of, vehicle defects that implicate serious safety issues, and to both (1) accept the responsibility to adequately fix or replace the Defective Class Vehicles and (2) absorb the cost to do so, rather than imposing those costs on their owners or lessees.

4.     The principal purpose of a rear subframe in a vehicle is to spread high chassis loads over a wide area of relatively thin sheet metal of a monocoque body shell, and to isolate vibrations and harshness from the rest of the body.  The subframe, which is below the vehicle's frame, supports its axle, suspension, and powerframe, thus providing stability and ride quality necessary to vehicle dynamics and safety.

5.     The Rear Subframe Assembly installed on each Class Vehicle is defective.  It does not provide adequate support or strength sufficient to endure, handle, or withstand the high horsepower and torque rating of the Class Vehicles

because it is designed, manufactured, and installed in such a manner that it can or does cause the single rear bolt to fracture or fail, which then causes the vehicle's rear differential to drop.  A failure of the single rear axle horizontal mounting bolt with respect to the Rear Subframe Assembly is especially dangerous when the vehicle is in operation.

6.     This Rear Subframe Assembly Defect is inherent in each Defective Class Vehicles and was present at the time of sale or lease of each Class Vehicle. But Ford ignored the Defect and its known consequences inherent in the Class Vehicles.  By 2019 – if not sooner – Defendant was aware that the Explorer ST vehicles with their higher horsepower and torque rated characteristic required a fourbolt rear subframe assembly (with two rear axle molting bolts), as more fully demonstrated by the pre-sale design and testing of the redesigned 2020 Ford ST. Ford even tested and designed its specifications for such vehicles requiring a fourbolt rear subframe assembly (with two rear axle mounting bolts) on the higher horsepower and torque rated Ford Explorer vehicles.

7.     However, Ford only implemented the fourbolt subframe in a small subset of the 2020 Ford Explorer STs with higher horsepower and torque ratings. Instead of utilizing the fourbolt assembly design, Ford used the currently designed and unsafe Rear Subframe Assembly - one rear axle mounting bolt - due to supply chain issues beginning in 2020 with the Covid pandemic, and to save costs.

8.     Ford has been aware that the Class Vehicles' Rear Subframe Assembly is defective and that due to the Defect, they would require frequent repair, could prematurely fail, would require replacement - including replacements outside the Ford's year/36,000 mile New Vehicle Limited Warranty - and that its intended replacements were as defective as the original Rear Subframe Assembly. Nonetheless, Ford equipped and continued to equip the Class Vehicles with the defective Rear Subframe Assembly.

9.     Ford is also aware that many owners and lessees of the Defective Class Vehicles have complained that their Rear Subframe Assembly requires or has required repair or replacement.  Still, consumers have been refused an adequate repair – even at times while within the warranty period.  Ford has also been aware that complaints have been made by Class Members to the National Highway Traffic Safety Administration ("NHTSA").   Nonetheless, Defendant's authorized dealerships have been feigning repair of the Defect with deflection and ineffective software updates, rather than addressing and remedying the actual Defect.

10.     Ford knowingly concealed and affirmatively took measures to conceal the Rear Subframe Assembly Defect and its failures and related malfunctions, even though Ford had secured and/or has possessed knowledge of material facts regarding the Rear Subframe Assembly Defect due to, *inter alia*, its pre-production testing, failure mode analysis, and complaints associated with the Defect both to dealers –

who are agents with respect to its vehicles – and NHTSA, dealer audits, aggregate warranty information, complaints by consumers on websites and internet forums, and internal sources of information available to Ford.  Defendant has even continued to conceal the defect despite internally issuing a Technical Service Bulletins ("TSB") to its authorized repair facilities and dealers, but not to owners or lessees. Ford dealers have been instructed to inform customers that their "vehicles are operating normally" or "operating as intended" – even though they are not – or otherwise give excuses for sub-par performance such as simply a rear subframe bolt fracturing, while continuing to deny the existence of the Defect.  Ford continued to conceal and obfuscate the true nature, extent, and depth of the Defect, instead, electing to deceptively claim that "in some of the affected vehicles, the rear axle mounting bolt may fracture during vehicle acceleration," adding that "a fractured rear axle bolt will allow the rear axle housing to move out of position, resulting in severe noise and vibration."  But it is the design and manufacture of the installed Rear Subframe Assembly itself that is defective rather than simply a defect of the bolt itself.

11.    Rather than repair the Defect under warranty, Ford dealers have also hidden the Defect by performing a "software update" and/or replacing the Rear Subframe Assembly only if and when the subframe bolt fails – and just once.  This is not a remediation:  it is a cover-up of the dangerous Defect and safety hazard.

12.     It is incumbent on Ford to immediately replace the defectively designed and manufactured Rear Subframe Assembly with the fourbolt rear subframe assembly (with two rear axle mounting bolts) that it has already and knowingly designed, tested, approved, and specified for higher horse power and torque-rated vehicles.

13.     Because of Ford's fraudulent concealment of the Defect in violation of state consumer protection acts and the common law of fraudulent concealment, its breaches of express warranties and implied warranties of merchantability, and its failure to act in disclosing and providing a remedy for the Defect, owners and lessees of Defective Class Vehicles are injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Defendant disclosed the Rear Subframe Assembly Defect, Plaintiffs and class members would not have purchased or leased their Class Vehicles or would have paid substantially less for them.

## II.    JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one member of the class of plaintiffs and one defendant are citizens

of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15.   This Court has specific personal jurisdiction over Defendant Ford because it is headquartered in Dearborn, Michigan. Defendant has purposefully availed itself of the benefits and protections of the State of Michigan by continuously and systematically conducting substantial business in and from this judicial district, directing advertising and marketing materials to districts within Michigan, and intentionally and purposefully placing the Defective Class Vehicles into the stream of commerce within Michigan, and throughout the United States, with the expectation and intent that consumers throughout the United States would purchase them.  Many thousands of Defective Class Vehicles have been sold in Michigan and across America, and are operated within this State and the judicial district.

16.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Ford transacts business in this judicial district, is subject to personal jurisdiction in this judicial district, and therefore is a citizen of this judicial district. Additionally, there are one or more authorized Ford dealers within this judicial district, Ford has advertised in this judicial district, and Ford has received substantial revenue and profits from its sales and/or leasing of Defective Class Vehicles in this judicial district; therefore, a substantial and material part of the events and/or omissions giving rise to the claims occurred within this judicial district.

### III.   PARTIES

**Plaintiffs**

18.   Plaintiff George Coolidge is a resident and citizen of Buffalo, New York, who purchased a new Defective Class Vehicle in April 2021 at West Herr Ford in Hamburg, New York. The Defective Class Vehicle is equipped with the Defective Rear Subframe Assembly. Prior to purchasing his Vehicle, a 2021 model year Ford Explorer XLT 2.3-liter, Plaintiff Coolidge researched vehicles and was not informed of any defect of design and/or manufacture relating to the Vehicle. Plaintiff Coolidge's Vehicle is subject to the Rear Subframe Assembly Defect. Instead, Plaintiff Coolidge was exposed to Ford's uniform and pervasive marketing messages of reliability, dependability, and safety. Plaintiff Coolidge is now concerned about his vehicle due to the Defect. Plaintiff Coolidge would not have purchased his vehicle, or would have paid less for it, had he known about the Defect prior to purchase.

19.   Plaintiff John Wiggins is a resident and citizen of Aurora, Colorado, who purchased a Class Vehicle in April 2022 with approximately 600 miles on it from Gary Yeomans Ford in Daytona Beach, Florida. Plaintiff Wiggins' Ford Explorer ST 2.3 liter is a Defective Class Vehicle equipped with the Rear Subframe Assembly Defect. Neither Mr. Wiggins, the registered owner of the vehicle, nor his wife, Antoinette Jordan, who assisted in the purchase of the vehicle, were informed

9

of any defect of design and/or manufacture relating to the Vehicle. Instead, Plaintiff Wiggins was exposed to Ford's uniform and pervasive marketing messages of reliability, dependability, and safety. Plaintiff Wiggins is now concerned about his vehicle due to the Defect. Plaintiff Wiggins would not have purchased his vehicle, or would have paid less for it, had he known about the Defect prior to purchase.

**Defendant**

20.     Defendant Ford Motor Company ("Ford") is a corporation organized and existing under the laws of the State of Delaware, and headquartered in Dearborn, Michigan.

21.     At all times relevant herein, Defendant was engaging in the business of designing, manufacturing, construction, assembling, marketing, distributing, and selling automobiles and other motor vehicles and motor vehicle components in the United States.

22.     Ford offers passenger cars, utility vehicles, minivans, trucks, and commercial vans, as well as distributes automotive service parts and accessories. Ford is also the warrantor and distributor of Ford vehicles, including the Class Vehicles, within and throughout the United States.

23.     From its headquarters in Michigan, Defendant Ford marketed the Class Vehicles to consumers.

24.     Ford and/or its agents designed and manufactured the Defective Class Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Defective Class Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. Ford is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

25.     As further detailed below, Ford authorized automobile dealerships act as Ford's agents in selling automobiles under the Ford name and disseminating vehicle information provided by Ford to customers. At all relevant times, Ford's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by Ford's manufacturer warranty pursuant to the contracts between Ford and its numerous authorized dealerships nationwide.

## IV.     FACTUAL ALLEGATIONS

**Background**

26.     Ford designed, manufactured, distributed, marketed, sold, and/or leased, and continues to sell or lease, the Class Vehicles, nationwide, directly or indirectly through dealers and other retail outlets.  Ford services the Class Vehicles through its nationwide network of authorized dealers and service providers.

27.     Purchasers or lessees of the Class Vehicles are provided a "New Vehicle Limited Warranty" ("NVLW") by Ford[1].  Defendant, via its authorized dealers, exercises sole authority in deciding if and to what extent a particular repair is covered under the NVLW.

***The Rear Subframe Assembly and Defect***

28.     The subframe is the structure below the frame that supports the axle, suspension, and powertrain, performing a critical role with respect to vehicle stability and ride quality central to vehicle dynamics and safety.  The principal purpose of the rear subframe in a vehicle is to spread high chassis loads over a wide area of relatively thin sheet metal of a monocoque body shell, and to isolate the vibrations and harshness from the rest of the body.  The subframe is a critical element between the road loads and the passenger compartment. It acts as a mount structure

---

[1]     The NVLW, which includes bumper to bumper warranty coverage, states, in relevant part:

Under your New Vehicle Limited Warranty if:
- your Ford vehicle is properly operated and maintained, and
- was taken to a Ford dealership for a warranted repair during the warranty period,
then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

for the suspension, and it reacts to vehicle travel on corners, on bumps, and acceleration and braking.

29.     In 2020, Ford redesigned the base Ford Explorer ST, including body, chassis, and motor changes. In the redesign to accommodate the higher horsepower and torque rating, the rear subframe of the Ford Explorer ST connected the rear differential using four bolts, including two rear axle horizontal mounting bolts.

30.     Despite the redesign, the Rear Subframe Assembly that is actually installed in each Class Vehicle is not the newly designed assembly, but is the prior designed assembly Ford needed to redesign to accommodate higher horsepower and torque rated Explorer ST vehicles – the one that is defective.  It does not provide adequate support or strength sufficient to endure, handle, or withstand the high horsepower and torque rating of the Class Vehicles because it is designed, manufactured, and installed in such a manner that it can or does cause its single rear bolt to fracture or fail, which then causes the vehicle's rear differential to drop.

31.     A failure of the single rear axle horizontal mounting bolt with respect to the Rear Subframe Assembly is especially dangerous when the vehicle is in operation.  The resulting dropping of a rear differential caused by such failure can result in the total loss of driver control – steering, breaking, and speed control – of the Class Vehicle while in operation, drastically increasing the risk of collision, while threatening and risking injuring passengers, bystanders, property and other

vehicles' drivers and passengers. All Class Vehicles' Rear Subframe Assemblies are designed, manufactured, and installed by Defendant in substantially the same manner. This Rear Subframe Assembly Defect is a significant safety hazard that is inherent in each Defective Class Vehicle and was present at their sale or lease.

32.     Ford only implemented the new fourbolt subframe in just a small subset of its 2020 Explorer ST's with higher horsepower and torque ratings, electing not to utilize the fourbolt subframe on the higher horsepower and torque rated Class Vehicles because of supply chain issues and to reduce costs, even though their subframe redesign was needed to remedy the Defect of the Rear Subframe Assembly and avoid the aforesaid dangerous safety risk.

33.     The Defect, inherent in all Class Vehicles, is caused by the improperly designed, manufactured, and/or installed Rear Subframe Assembly in the Class Vehicles. Plaintiffs are informed and believe and thereupon allege that Defendant intentionally decided to continue to use the weaker, one mounting bolt rear subframe assembly for the Class Vehicles, despite the new design and safety protocols that would accommodate the higher horsepower and torque ratings of the Class Vehicle, which require a rear subframe that allows for four bolts total, including two rear axle horizontal mounting bolts, to be used to connect it to the rear differential.

*Ford is Aware of the Rear Subframe Assembly Defect and Need for the Fourbolt Subframe Assembly*

34.     Defendant knew of and was aware of material facts regarding the Rear Subframe Assembly Defect from a variety of additional ways and sources.   For example, Ford knew of the Defect by virtue of its pre-production testing, manufacturing quality control audits, and post-sale complaints by Class Vehicle consumers who experienced the Rear Subframe Assembly Defect.

➢     *NHTSA Complaints*

35.     Federal law has required Defendant, at all times material, to be in close contact with NHTSA regarding potential automobile defects.   Federal law also imposes a legal requirement compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000). Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.*

36.     Automakers such as Ford monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential safety related defects in their vehicles.   Defendant, given its superior knowledge and expertise, knew or should have known of the many complaints revealing the Rear Subframe Assembly Defect logged by NHTSA Office of Defects Investigation (ODI).   Some examples below of such complaints available on the

NHTSA website reveal that Ford's network of dealers and repair technicians, have been aware of the Rear Subframe Assembly Defect and, that despite having knowledge of the Defect and the Class Vehicles affected, often refused to diagnose the defect or otherwise attempt to repair it, even while Class Vehicles were still under warranty.  Plaintiffs are informed and believe and thereupon allege that Ford had this knowledge and placed its imprimatur on it, at all times material:

    a.  **DATE OF INCIDENT**: April 20, 2022
        **DATE COMPLAINT FILED**: April 20, 2022
        **NHTSA/ODI ID**: 11461576
        **SUMMARY**: Ford released a bulletin - 22S27- to all dealers to immediately stop demo/delivery for all new Explorers in stock as of 4/19/22. At issue is a possibility of a fractured bolt that causes the differential to separate and cause "severe vibration" rendering the vehicle disabled. No fix was mentioned other than a software update possibly by the end of June 22 (2d qtr). This is serious if dealers are told to stop delivery! I just got mine in the beginning of April. Ford needs to step up and address this to ALL owners and not just dealers. It appears that Ford is waiting for failure of the parts before allowing any repairs. So far, only software is mentioned which supposedly throttles the engine to avoid putting stress on the rear end. This of course does NOT address the physical issue with a fractured bolt. Apparently, Ford redesigned the differential to use only one bolt vs two they had used earlier. Please pursue this as soon as possible with Ford to make them put out an emergency recall to resolve this very serious defect in manufacturing. Normally, recalls are for something that can be addressed eventually based on reported issues. However, there have not been that many incidents. For Ford to issue this notice to dealers indicates the seriousness or expected seriousness. Thank you for your attention!

    b.  **DATE OF INCIDENT**: June 17, 2022
        **DATE COMPLAINT FILED**: June 17, 2022 NHTSA/ODI ID: 11469737 **SUMMARY**: Feedback on Manufacturer Recall Number 22S27, NHTSA Recall 22V255 Allowing Ford to reprogram the

powertrain control unit (ECU) on this vehicle so that the vehicle applies the emergency brake whenever the vehicle is placed in park in order to prevent the vehicle from rolling away if/when this one bolt breaks on the rear differential is NOT sufficient. The 2020 MY Ford Explorer ST/Plantium models have two bolts attaching the rear differential to the rear subframe. The equivalent 2020-2022 Lincoln Aviator also has two bolts on this part. The issue is that Ford ran out of the correct rear subframe parts and substituted a part for a lower powered powertrain, or this was a cost cutting measure gone bad. Cross referencing Ford's own parts numbers with the VIN shows the incorrect rear subframe installed at the factory. NHTSA should require Ford to properly and securely attach the rear differential to the rear subframe of the vehicle to prevent this issue. Allowing a workaround, use of parking brake to prevent rollaway, is not ok. Additionally, the equivalent police interceptor is obtaining the correct rear subframe as part of the manufacture defect resolution. Why wouldn't the others receive the same fix? 2021 Ford Explorer ST

c. **DATE OF INCIDENT**: June 23, 2022
   **DATE COMPLAINT FILED**: June 23, 2022
   **NHTSA/ODI ID**: 11470689
   **SUMMARY**: The contact owns a 2020 Ford Explorer. The contact received notification of NHTSA Campaign Number: 22V255000 (Power Train) and the fix stated that the dealer would update the electronic parking brake software but not replace the bolts.  The contact had not experienced a failure. The contact stated that he called the dealer and it was confirmed that the remedy was to update the electronic parking brake software. The manufacturer was contacted and confirmed the remedy and a case was opened. The manufacturer offered no further assistance. Parts distribution disconnect.

d. **DATE OF INCIDENT**: August 23, 2022
   **DATE COMPLAINT FILED**: August 27, 2022
   **NHTSA/ODI ID**: 11481543
   **SUMMARY**: I recently had the recall addressed at my local Ford dealer, Performance Ford in Randolph, NJ. Ford is only allowing dealerships to reprogram the parking break to engage whenever the vehicle is placed in park. If the axle bolt were to shear, it would

disengage, allowing the vehicle to roll in park. This remedy does not adequately address the underlying issue- which was the fact that Ford's Chicago mfg facility used a part designed for the 4-cyl engine power train, not the 4 bolt design required in the Police Interceptor and Explorer ST versions. The police version will be getting the parts upgraded while consumers are left with a band-aid solution. NHTSA should force Ford to address the issue- which is an inadequate bolt configuration for the HP/Torque output of performance version Explorers. This is a safety hazard as the bolt can snap while in use, disconnecting the drive axle from the rear differential. 2022 Ford Explorer ST

e. **DATE OF INCIDENT**: February 25, 2021
   **DATE COMPLAINT FILED**: September 23, 2022
   **NHTSA/ODI ID**: 11485961
   **SUMMARY**: My Explorer ST has the issue of having the incorrect rear subframe for the high-performance engine with only one bolt holding the differential to the rear subframe. I have talked to all of the Ford dealerships in my area. They said that this is a problem, but Ford has not provided a solution or any timeframe to fix this major issue. Another example of Ford not caring about their customers and putting profits ahead of safety. Why did they think that they could get away with installing incorrect parts for the four-cylinder engine on a vehicle that develops substantially higher HP and torque. This is my first and last Ford product I will ever buy. Why doesn't the NHTSA force Ford to fix this potentially dangerous issue.

f. **DATE OF INCIDENT**: October 3, 2022
   **DATE COMPLAINT FILED**: November 9, 2022
   **NHTSA/ODI ID**: 11492971 SUMMARY: Rear subframe bolt bushing broke. (See existing recall for the rear subframe bolt breaking). This vehicle had recall performed which actually didn't address the engineering shortfall from Ford using the wrong, lighter duty, subframe on the ST model. This subframe only has one bolt holding the rear diff to the subframe. The 2020 model had two bolts, as do all MY of the Lincoln Aviator. While Ford is fixing this under warranty, using the same subframe will not fix this issue. Result will be that the bolt may break or the bushing may fail. A broken bolt will result in the drive shaft disconnecting while driving, loss of

acceleration, potential wreck from drive shaft hitting ground at speed.

> ➢ ***Customer Complaints on Third-Party Websites***

37.    Complaints posted by consumers in internet forums also demonstrate the widespread Defect which can manifest without warning. The complaints which reference contact with authorized dealerships and Defendant itself, are monitored by Ford staff.

38.    For example, the following exchange on the "Ford Explorer ST Forum" group on facebook.com by four consumers of Ford Explorer ST vehicles illustrates relevant complaints:

> Consumer 1: So, the dealer "fixed" my differential bolt recall with a computer update. Tell the computer what to do if it happens. But now my emergency brake is on every time I start. Is there a way to turn it off?
>
> Consumer 2: Not without reprogramming…which will put strain on that single diff bolt if you are parked on an incline and forget to manually set it…so that will put you right back where you started. Several of my dealer clients said this 'fix' still doesn't cure the potential problem under hard acceleration. Ask Tyler about the aftermarket reinforcement options.
>
> Consumer 3: Are they ever going to fix the 1 bolt issue, with the correct subframe and leave the e-brake alone?
>
> Consumer 4: Dealer told me it was a bandaid until a real fix gets rolled out. Consumer 3: hopefully, some are saying that it must break before they fix it

> ➢ *Additional Facts Demonstrating Ford's Knowledge*

39.    Since at least 2019, Defendant knew the Class Vehicles required the fourbolt subframe assembly.  By the beginning of 2020, Defendant was well aware of the Rear Subframe Assembly Defect through sources not available to consumers, such as Ford's pre-release testing data, consumer complaints to Defendant and its dealers – agents for vehicle repairs – failure rates, and replacement part sales data, its own developed TSBs[2] addressing the Rear Subframe Assembly Defect, and through communications from Defendant's dealers about the problem.

40.    Defendant is experienced in the design and manufacture of vehicles. Ford conducts tests, including pre-sale durability testing, on vehicle components, including the Rear Subframe Assembly, to verify they are free from defect and align with Defendant's specifications.  Given its superior knowledge and expertise, Defendant knew or should have known the Rear Subframe Assembly was defective and prone to putting drivers in a dangerous position due to the inherent risks caused by the Defect.

41.    Ford also knew of the impact of the Defect from communications from dealerships and its customer relations department, which interacts with dealerships regarding potential common defects.  Knowledge of the Defect through dealer

---

[2]    TSBs are issued only to Defendant's dealerships and service providers.  They are not disseminated to consumers, even if their vehicles receive services as outlined in the TSBs.

communications led to the release of TSBs by Ford. Defendant's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

42.     Ford's warranty department also analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. When a repair is made under warranty, the dealership provides Defendant with detailed documentation of the problem, disclosing the repairs to correct it.  The justification for reimbursement must be sufficiently detailed.  Absent providing detailed information to Defendant, dealers would not be reimbursed for any repairs.

43.     Further demonstrating its knowledge of the Defect and continuing deflection and cover-up, Ford issued Special Service Message ("SSM") 50471 in February 2022 for Model Year ("MY") 2020-2022 Ford Explorer ST vehicles, advising dealers that "[s]ome 2020-2022 Explorer vehicles may exhibit a rear axle mounting bolt that has broken." Ford stated that, "[i]n order to correct the condition, the rear subframe, differential cover, and mounting bolts will need to be replaced in addition to any other damaged components."  On April 14, 2022, Ford issued a Safety Recall Report (Manufacturer Recall No. 22S27) recalling 2020-2022 Ford Explorer 2.3L RWD / 3.0L PHEV / 3.3 L FHEV Retail / 3.0L ST gas vehicles.

Again, without disclosing the inherent Defect, Ford's Safety Recall Report ("Recall") focused on the bolt itself and stated that the affected vehicles are "equipped with suspect rear axle bolts and [sic] an older version of Electronic Park Brake Software."  The Recall described the safety risk of this defect as follows: If the rear axle bolt breaks, the driveshaft/half shafts may become disconnected, resulting in loss of transmission torque to the rear wheels which is necessary to hold the vehicle in park. If the parking brake is not applied, the loss of the primary park torque will allow the vehicle to roll in park increasing the risk of crash and injury." The above-described issue occurs without warning ("Identification of Any Warning that can Occur: NA").  But the remedial program initiated by Ford as part of the Recall that instructed affected vehicle owners to "take their vehicle to a Ford or Lincoln dealer to have the PCM software updated to engage the Electronic Park Brake" did not address the Defect or disclose it to consumers.

44.    On April 19, 2022, Ford issued a Delivery Hold to all U.S. Ford and Lincoln Dealers pursuant to the Recall that stated, "[i]n some of the affected vehicles, the rear axle mounting bolt may fracture during vehicle acceleration. A fractured rear axle bolt will allow the rear axle housing to move out of position, resulting in severe noise and vibration." In truth, if the driveshaft/half shaft is disconnected, there is loss of transmission torque to the rear wheels, and a consequential loss of power while the vehicle is being driven. The driver could even

lose complete control of the vehicle, vastly increasing the risk of safety hazards, including collisions. In such cases, a software update that engages the Electronic Parking Brake when in Park does nothing to remedy the defect, and a one-time repair that is only provided once the bolt has already fractured is patently inadequate. Nonetheless, in June 2022, Ford began Customer Satisfaction Program 22N06, which provided a "one-time repair (if needed) to the parts required to replace a rear subframe bushing and axle cover due to a rear axle bolt bending and fracturing for ten (10) years of service or 150,000 miles from the warranty start date of the vehicle, whichever occurs first."

45.    Discovery will show that the problem persists despite Ford's software update Recall, as a result of the Defect as described herein.

46.    Each TSB, customer satisfaction program, service action, delivery hold, and recall issued by Defendant was approved by managers, directors, and/or executives at Ford.  Ford's managers, directors, and/or executives knew, or should have known, about the Rear Subframe Assembly Defect, but refused to disclose the Defect to prospective purchasers and owners, and/or actively concealed the Defect.

47.    Despite their knowledge of the Rear Subframe Assembly Defect in the Class Vehicles, Defendant actively concealed the existence and nature of the defect from Plaintiffs and Class Members at the time of sale or lease and thereafter.

48.     The Rear Subframe Assembly Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Rear Subframe Assembly Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

49.     Plaintiffs and Class Members further reasonably expect that Defendant will not sell or lease vehicles with known safety defects, such as the Rear Subframe Assembly Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Defendant to conceal and fail to disclose the Rear Subframe Assembly Defect to them, and to then continually deny its existence or cover it up.

50.     Defendant has caused Plaintiffs and Class Members to expend money and/or time at their dealerships to diagnose, repair or replace the Class Vehicles' Rear Subframe Assembly and/or related components, despite Defendant's knowledge of the Rear Subframe Assembly Defect.

## V.      TOLLING OF THE STATUTE OF LIMITATIONS

### A.      Discovery Rule Tolling

17.     Because Ford concealed the existence of the Defect, Class members had no way of knowing about the unreasonable risk of the Defective Class Vehicles.

18.     Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that Ford was concealing the conduct complained of herein.

19.     Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Ford had concealed information about the unreasonable risk of the Defect respecting and inherent in the Class Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

20.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Defective Class Vehicles.

**B.     Fraudulent Concealment Tolling**

21.     All applicable statutes of limitation have also been tolled by Ford's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

### C.    Estoppel

22.    Ford was under a continuous duty to disclose to Plaintiffs and the other Class Members the true character, quality, and nature of the fire risk of the Defective Class Vehicles.

23.    Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the Defect with respect to the Class Vehicles.

24.    Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VI.   CLASS ALLEGATIONS

25.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following classes:

> **Nationwide Class:** All persons or entities who purchased or leased one or more model year 2020-present Ford Explorer 2.3L or 3.0L ST vehicles, (the "Defective Class Vehicles").
>
> **New York State Sub-Class:**  All persons or entities in the state of New York who purchased or leased one or more model year 2020-present Ford Explorer 2.3L or 3.0L ST vehicles, (the "Defective Class Vehicles").
>
> **Colorado Sub-Class:** All persons or entities in the state of Colorado who purchased or leased one or more model year 2020-present Ford Explorer 2.3L or 3.0L ST vehicles, (the "Defective Class Vehicles").

26.    The New York State Sub-Class and the Colorado Sub-Class are collectively referred to herein as the "State Sub-Classes."  Plaintiffs assert claims under the federal law or the law of each state as set forth below.

27.    Excluded from each Class are individuals who have personal injury claims resulting from the fires or explosions caused by the Defective Class Vehicles. Also excluded from the Class are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

28.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

29.    This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Federal Rule of Civil Procedure 23.

30.    **Numerosity:** Federal Rule of Civil Procedure 23(a)(1): The members of each Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. The precise number of Class members is unknown to Plaintiffs but may be ascertained from Ford's books and records. Class

members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

31.     **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a)     Whether Ford engaged in the conduct alleged herein;

b)     Whether the Vehicle Defect creates an unreasonable risk of coherent in the Defective Class Vehicles;

c)     When Ford first knew about the Vehicle Defect;

d)     Whether Ford designed, manufactured, marketed, and distributed the Defective Class Vehicles with defective high-voltage batteries;

e)     Whether Ford's conduct renders it liable for breach of the implied warranty of merchantability;

f)     Whether Ford has been unjustly enriched at the expense of Plaintiffs and the Classes;

g)     Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale; and

h)      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

32.    **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Ford's wrongful conduct as described above.

33.    **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

34.    **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Classes to individually seek redress for Ford's wrongful conduct. Even if Class members

could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   CLAIMS

### COUNT I
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
(15 U.S.C. § 2301, *et seq*.)
**(Alleged by all Plaintiffs on behalf of the Nationwide Class or, in the alternative,**
**Their Respective State Sub-Classes)**

35.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

36.     Plaintiffs bring this claim on behalf of the Nationwide Class and, in the alternative, on behalf of their Respective State Sub-Class.

37.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

38.     The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

39.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

40.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

41.    Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Class Vehicles' Subframe Assemblies were fit for their ordinary purpose as safe and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

42.    Ford breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common defect in that they are all equipped with the defective rear suspension assembly making the vehicles susceptible to a risk of failure and loss of control during operation, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Class Vehicles and passengers, bystanders, other vehicle occupants, pedestrians and property. This defect rendered the Class Vehicles, when

sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

43.    As discussed above, on information and belief, Ford skimped on available safety technologies that could have prevented the subframe disconnection risk, and, through testing done prior to launching the Class Vehicles, Ford knew or should have known of the defect. Yet, in order to pad its bottom line Ford intentionally or recklessly foisted the unreasonably dangerous Class Vehicles on unwitting class members.

44.    Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

45.    Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiffs, as, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

46.    Any limitations Ford might seek to impose on its warranties are substantively unconscionable.  Ford knew that the Class Vehicles were defective and that they could when used as intended long before Plaintiffs and the Class could or would discern the existing defect.  Ford failed to adequately disclose the

Defect to Plaintiffs and the Class. Thus, any attempted enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

47.    Plaintiffs have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as the defect presents an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Class Vehicles as well as to  property, and vehicles, passengers, pedestrians and bystanders.

48.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

49.    Plaintiffs would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because

Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Class Vehicles by retaining them.

50.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class members in connection with the commencement and prosecution of this action.

51.     Plaintiffs also seek the establishment of an Ford-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and/or mitigate the effects of the Defect in their Class Vehicles.

**COUNT II**
**FRAUDULENT CONCEALMENT**
**(COMMON LAW)**
**(Alleged by all Plaintiffs on behalf of the Nationwide Class or,**
**in the alternative, the State Sub-Classes)**

52.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

53.     Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of their respective State Sub-Classes.

54.     A nationwide class is appropriate because the elements of a fraudulent concealment (or "fraud by concealment") claim are virtually identical in all states. In all states, Plaintiffs can prevail by showing that: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Class Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Class Vehicles, or (b) knowingly concealed material information in connection with the sale or lease of the Class Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Class Vehicles; and (iii) as a result of Ford's conduct, Plaintiffs suffered economic damages.

55.     Ford concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

56.   Ford sold the Class Vehicles to Plaintiffs without disclosing the true nature of the Defect, including the Risk, and concealed and suppressed the defect from regulators and consumers.

57.   Ford concealed and suppressed the true nature of the Class Vehicles, as well as the risk, with the intent to deceive Plaintiffs.

58.   Ford concealed and suppressed the true nature of the "recall repair" it is performing on the Class Vehicles, with the intent to deceive Plaintiffs into believing it was rectifying the Defect.

59.   Ford did so in order to falsely assure purchasers, lessees, and owners of the Class Vehicles that the vehicles they were purchasing or leasing were safe and to avoid costs and the requisite safety technology and/or rigorous testing of the subframe assemblies prior to launching the Class Vehicles, and then to avoid for a substantial period of time the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality and safety of the Class Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

60.   Ford had a duty to disclose the true nature of the Class Vehicles, as well as the Defect because it was known and/ only knowable by Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiffs.  Ford also had a duty to

disclose because it made many affirmative representations about the safety and quality of the Class Vehicles, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Defect. Having provided information to Plaintiffs, Ford had the duty to disclose not just the partial truth, but the entire truth. Finally, once the Class Vehicles were on the road, Ford had a duty to monitor the vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

61.   Ford concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiffs and the Nationwide Class.

62.   On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding the Defect, well as whether the "Recall Repair" actually repairs the Defect of the Class Vehicles.

63.   Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased their Class Vehicles and paid the high premium as the result of Ford's claims that they could be safely operated.

Plaintiffs' actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

64. Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage. In purchasing or leasing their Class Vehicles, Plaintiffs did not get the benefit of their bargain since the vehicles were worth less than they would have been without the Defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy the Defect. Those Class members who sold their dangerous Class Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiffs been aware of the concealed Defect that existed in the Class Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all.

65. Accordingly, Ford is liable to Plaintiffs, the Nationwide Class and/or the State Sub-Classes for damages in an amount to be proven at trial.

66. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
## FRAUDULENT OMISSION
**(Alleged by all Plaintiffs on behalf of the Nationwide Class or,
in the alternative, the State Sub-Classes)**

67.     Plaintiffs and reallege and incorporate by reference all paragraphs as though fully set forth herein.

68.     Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of their respective State Sub-Classes.

69.     Ford was aware of the Defect within the Class Vehicles, as well as the true nature of the Class Vehicles as a whole, when it marketed and sold the Class Vehicles to Plaintiffs and the Nationwide Class and/or State Sub-Classes ("Classes").

70.     Having been aware of the Defect within the Class Vehicles, as well as the true nature of the Class Vehicles as a whole, and having known that Plaintiffs and the other members of the Nationwide Class and/or State Sub-Classes could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to Plaintiffs and the other members of the Classes in connection with the sale or lease of the Class Vehicles.

71.     Ford did not disclose the Defect or the true nature of the Class Vehicles to Plaintiffs and members of the Classes in connection with the sale or lease of the Class Vehicles.

72.    For the reasons set forth above, the Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

73.    In purchasing and leasing the Class Vehicles, Plaintiffs and the other members of the Classes reasonably relied on Ford to disclose known material defects with respect to the Class Vehicles.

74.    Had Plaintiffs and the other members of the Classes known of the true nature of the Class Vehicles, including the Defect, they would not have purchased or leased the Class Vehicles or would have paid less for the Class Vehicles.

75.    Through its omissions regarding the true nature of the Class Vehicles, as well as the Defect, Ford intended to induce, and did induce, Plaintiffs and the other members of the Classes to either purchase or lease a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

76.    As a direct and proximate result of Ford's omissions, Plaintiffs and the other members of the Nationwide Class and State Sub-Classes either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the true nature of the Class Vehicles, including the Defect, had been disclosed to them and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(COMMON LAW)**
**(Alleged by all Plaintiffs on behalf of the Nationwide Class or,**
**in the alternative, the State Sub-Classes)**

77.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

78.    Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the State-specific Sub-Classes. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all the states.

79.    This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class.

80.    Ford has received and retained a benefit from Plaintiffs and Nationwide Class members and inequity has resulted.

81.    Ford has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth as a result of Ford's conduct, and Plaintiffs, Nationwide Class Members and State Sub-Class members have overpaid for the Class Vehicles and been forced to pay other costs.

82.    Thus, Plaintiffs, members of the Nationwide Class and members of the State Sub-Classes conferred a benefit on Ford.

83.    It is inequitable for Ford to retain these benefits.

84.    Plaintiffs, Nationwide Class Members and State Sub-Class members were not aware of the true facts about the Class Vehicles and did not benefit from Ford's conduct.

85.    Ford knowingly accepted the benefits of its unjust conduct.

86.    As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**COUNT V**
**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**
**(Col. Rev. Stat. § 6-1-101, *et seq.*)**
**(Alleged by Plaintiff Wiggins on behalf of the Colorado Sub-Class)**

87.    Plaintiff Wiggins and the Colorado Sub-Class ("Plaintiffs," for the purposes of this claim) reallege and incorporate by reference all paragraphs as though fully set forth herein.

88.    Plaintiffs bring this action on behalf of themselves and the Colorado Sub-Class.

89.    FORD is a "person" within the meaning of § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101, *et seq*.

90.    Plaintiffs are "consumer" for purposes of Col. Rev. Stat § 6-1-113(1)(a).

91.    The Colorado CPA prohibits deceptive trade practices in the course of a person's business. Ford engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the

42

characteristics, uses, and benefits of the Class Vehicles that had the capacity or tendency to deceive Plaintiffs; (2) representing that the Class Vehicles are of a particular standard, quality, and grade even though Ford knew or should have known they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Class Vehicles that was known to Ford at the time of advertisement or sale with the intent to induce Plaintiffs to purchase, lease or retain the Class Vehicles.

92.    In the course of its business, Ford concealed the Rear Subframe Assembly Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

93.    By failing to disclose and by actively concealing the Defect in the Class Vehicles, as well as the true nature of the Class Vehicles, which it presented to the market as safe, reliable, of high quality, and fit for use vehicles, Ford engaged in unfair and deceptive business practices in violation of the Colorado CPA.

94.    In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the Class Vehicles.

95.    Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the Colorado Sub-Class members, about the true safety, quality and reliability of their vehicles.

96.    Ford intentionally and knowingly misrepresented and/or concealed material facts regarding the Class Vehicles with the intent to mislead Plaintiffs.

97.    Ford knew or should have known that its conduct violated the Colorado CPA.

98.    As alleged above, Ford made material statements and/or material omissions regarding the safety, quality and reliability of the Class Vehicles when operating them that were either false, misleading, or deceptive.

99.    Ford owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because Ford:

    a.  Possessed exclusive knowledge about the Rear Subframe Assembly Defect;

    b.  Intentionally concealed the foregoing from Plaintiffs;

    c.  Made incomplete representations about the safety, quality and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiff and Colorado Sub-Class that contradicted these representations; and/or

d.  Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

100.   Because Ford fraudulently concealed the Defect, as well as the true nature of the Class Vehicles, Plaintiffs were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from this dangerous Defect. Had Plaintiffs been aware of the Defect in their vehicles, they would either not have bought or leased their Class Vehicles or would have paid less for them.

101.   Ford's concealment of the Defect was material to Plaintiffs.

102.   Plaintiffs suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose the Defect. Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.

103.   Ford's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, Ford has yet to fix the Class Vehicles.  Ford's unlawful acts and practices complained of herein affect the public interest.

104.   As a direct and proximate result of Ford's violations of the Colorado CPA, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above.

105.   Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for Plaintiff and each member of the Colorado Sub-Class.

106.   Plaintiffs also seeks an order enjoining Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

**COUNT VI**
**NEW YORK: DECEPTIVE ACTS OR PRACTICES**
**(N.Y. Gen. Bus. Law § 349)**
**(Alleged by Plaintiff George Coolidge on behalf of the New York State Sub-Class)**

107.   Plaintiff Coolidge realleges and incorporates by reference all paragraphs as though fully set forth herein.

108.   This Count is asserted by Plaintiff Coolidge and New York State Sub-Class members who purchased or leased a Class Vehicle with the Rear Subframe Assembly Defect.

109.   New York General Business Law ("G.B.L.") § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

110.   In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk of the Defect in the Class Vehicles, as

described above. Accordingly, Ford made untrue, deceptive or misleading representations of material facts to and omitted and/or concealed material facts.

111. Ford engaged in a deceptive acts or practices when it failed to disclose material information concerning the Ford Class Vehicles which was known to Ford at the time of the sale. Ford deliberately withheld the information about the vehicles' Defect, and the vehicle's quality, reliability and safety issues in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

112. The existence of the inherent defect of the Class Vehicles, and the related issues regarding their quality, reliability and safety were material to Plaintiffs and the New York Sub-Class. Had Plaintiff and the New York Sub-Class known that their Class Vehicles had these serious safety, quality and reliability issues, they would not have purchased them.

113. Because Ford's deception takes place in the context of automobile safety, that deception affects the public interest.

114. Ford's unlawful conduct constitutes unfair acts or practices that have the capacity to and that do deceive consumers and have a broad impact on consumers at large.

115. Plaintiff and the New York Sub-Class suffered injury caused by Ford's failure to disclose material information. Plaintiff and the New York Sub-

Class overpaid for their Class Vehicles and did not receive the benefit of their bargain. The value of their Class Vehicles has diminished now that the safety issues have come to light, and Plaintiff and the New York Sub-Class own vehicles that are not safe.

116.   Pursuant to G.B.L. § 349, Plaintiff and the New York Sub-Class members are each entitled to recover the greater of actual damages or $50 apiece. Because Ford acted willfully or knowingly, Plaintiff and each member of the New York Class are each entitled to recover three times actual damages, up to $1,000.

**COUNT VII**
**NEW YORK: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.Y. U.C.C. § 2-314)**
**(Alleged by Plaintiff Coolidge on behalf of the New York State Sub-Class)**

117.   Plaintiff Coolidge realleges and incorporates by reference all paragraphs as though fully set forth herein.

118.   This Count is asserted on behalf of Plaintiff Coolidge and the New York State Sub-Class members who purchased or leased their Class Vehicle.

119.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

120.   The Class Vehicles sold by Ford are "things of danger," in that they are of such a character that when used for the purpose for which they are made

they are likely to be a source of danger to several or many people if not properly designed and fashioned.

121.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

122.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that their Rear Subframe Assembly Defect can disconnect while in operation causing loss of driver: a significant and dangerous safety risk.

123.   Ford was provided notice of these issues by NHTSA complaints, numerous complaints to dealers, the instant complaint, and by other public complaints on the web or internet, and communications by consumers before or within a reasonable amount of time heretofore.

124.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Coolidge and the New York State Sub-Class have been damaged in an amount to be proven at trial.

**COUNT VIII**
**COLORADO: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Col. Rev. Stat. § 4-2-314)**
**(Alleged by Plaintiff Wiggins on behalf of the Colorado State Sub-Class)**

125.   Plaintiff Wiggins realleges and incorporates by reference all paragraphs as though fully set forth herein.

126.   This Count is asserted on behalf of Plaintiff Wiggins and the Colorado State Sub-Class members who purchased or leased their Class Vehicle.

127.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

128.   The Class Vehicles sold by Ford are "things of danger," in that they are of such a character that when used for the purpose for which they are made they are likely to be a source of danger to several or many people if not properly designed and fashioned.

129.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

130.   These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that their Rear Subframe Assembly Defect can disconnect while in operation causing loss of driver: a significant and dangerous safety risk.

131.   Ford was provided notice of these issues by NHTSA complaints, numerous complaints to dealers, the instant complaint, and by other public

complaints on the web or internet, and communications by consumers before or within a reasonable amount of time heretofore.

132. It was reasonable to expect that Plaintiff and class members would use, consume, or be affected by the Defective Class Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability under Col. Rev. Stat. § 4-2-318.

133. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Wiggins and the Colorado State Sub-Class have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

134. **WHEREFORE**, Plaintiffs, on behalf of themselves and members of the respective classes, as appropriate, respectfully requests that this Court:

(a)     determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

(b)     appoint Plaintiffs as representatives of the Nationwide Class as well as the Colorado and New York Subclasses, as appropriate, and their counsel as Class counsel;

(c)     award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and members of the Class are entitled under the claims and causes of action as alleged above, at this time;

(d)     award pre-judgment and post-judgment interest on any monetary relief;

(e)     award reasonable attorneys' fees and costs; and

(f)     grant such further relief that this Court deems appropriate.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**

Date: June 19, 2023

By *E. Powell Miller*
E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
dal@millerlawpc.com

**BARRACK, RODOS, & BACINE**
Stephen R. Basser
Samuel M. Ward
600 W Broadway, Suite 900
San Diego, CA 92101
Telephone: (619)230-0800
Facsimile: (619) 230-1874
sbasser@barrack.com
sward@barrack.com

**EMERSON FIRM, PLLC**
John G. Emerson
2500 Wilcrest, Suite 300

Houston, TX 77042
jemerson@emersonfirm.com
Telephone: (800) 551-8649
Facsimile: (501) 286-4659

*Attorneys for Plaintiffs and the Proposed Class*